UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAQUAL WARREN,

              Plaintiff,

                                     Case No. 2:19-cv-13121

v.                                   Paul D. Borman
                                   United States District Judge

HOLLINGSWORTH MANAGEMENT
SERVICES, LLC, et al.,

              Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

This case arises out of Plaintiff Raqual Warren's employment with Defendants Hollingsworth Management Services, LLC; Hollingsworth, LLC; and Hollingsworth Logistics Group, LLC (collectively "Hollingsworth") from November 2016 through February 2018. Warren alleges that Hollingsworth violated Title VII by discriminating against her based on her race and retaliating against her for opposing race and sex discrimination. Now before the Court is Hollingsworth's Motion for Summary Judgment.

1

## I.      STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A. Statement of Facts

On or about November 7, 2016, Warren, an African-American female, began employment as an Order Filler for Hollingsworth. (ECF No. 15, Amended Complaint, PageID 95; ECF No. 34-5, Confidentiality Agreement, PageID 609). She worked in the 350,000 square foot Temperance, Michigan warehouse, where about 60 to 70 employees sorted bags, sleeves, and trays for the United States Postal Service. (ECF No. 34-4, Dep. of S. Paulson, PageID 516–17). The job was physically demanding and turnover at the warehouse was high. (ECF No. 34-4, PageID 523–24).

Warren could report to any supervisor, including Michael Rioux, a white male. (ECF No. 34-4, Dep. of S. Paulson, PageID 535; ECF No. 34-6, Dep. of R. Warren, PageID 760). During her time as an Order Filler, Warren complained to Rioux about "the conditions of the work area" and asked to move to the other side of the building, which had better equipment. (ECF No. 34-6, PageID 761). According to Warren, Rioux told her that others, who had started at the same time as her, had been moved to the other side before her request because "Hispanics work faster." (ECF No. 34-6, PageID 762). Warren believed that a "majority" of those who had been moved were Hispanic, based on their looks. (ECF No. 34-6, PageID 764).

2

In September of 2017, Hollingsworth promoted Rioux to "Warehouse Manager" and created three new "Floor Supervisor" positions for him to oversee. (ECF No. 34-5, Promotion Notice, PageID 608; ECF No. 36, Response to Motion for Summary Judgment, PageID 888). Rioux and his then-supervisor, Matt Johnson, decided to promote Warren to one of these new positions, based on her past experience as a manager at McDonald's. (ECF No. 34, Motion for Summary Judgment, PageID 174; ECF No. 34-4, Dep. of S. Paulson, PageID 536). They also promoted Jeremy McKinney, who had experience as a supervisor at a newspaper, (ECF No. 34-4, PageID 536), and Vickie Gottschalk, who had known Rioux since before she started at Hollingsworth, (ECF No. 34-2, Dep. of M. Rioux, PageID 383). (ECF No. 34, PageID 174). McKinney and Gottschalk are both white. (ECF No. 36, PageID 890, 892). Warren became the Supervisor of the trays department, McKinney became the Supervisor of the bags department, and Gottschalk became the Supervisor of the sleeves department. (ECF No. 36, PageID 888). Hollingsworth did not offer any formal training for these new positions. (ECF No. 34-4, PageID 537).

As Supervisors, Warren, McKinney, and Gottschalk were responsible for leading and motivating their teams, answering their teams' questions, keeping their areas clean, ensuring that their teams reached their sorting targets, and contributing to individual sorting work as needed. (ECF No. 34-4, Dep. of S. Paulson, PageID 547; ECF No. 34-6, Dep. of R. Warren, PageID 784). Upon her promotion, Warren started

two journals in which she "documented . . . goals that needed to be met," "things that happened during the day," her "plans . . . for building or just [her] area," and "complaints." (ECF No. 34-6, PageID 786–87).

Warren's time as a supervisor did not go smoothly. According to Warren, she faced discrimination and mistreatment as follows:

First, in November of 2017, one of Warren's team members told her that he would report to Rioux, rather than to Warren, his direct supervisor, because "where [he was] from, . . . women d[id]n't have authority over [men]." (ECF No. 34-6, Dep. of R. Warren, PageID 798; ECF No. 36, Response to Motion for Summary Judgment, PageID 889). When Warren met with Rioux about the issue, Rioux "sided with" the team member, allowing him to report to Rioux. (ECF No. 34-6, PageID 798).

Next, on December 4, 2017, Rioux "apologize[d] to [Warren]" for "understimat[ing] [her] ability as a supervisor" because she was "a young, Black, petite female." (ECF No. 34-6, Dep. of R. Warren, PageID 801; ECF No. 36, Response to Motion for Summary Judgment, PageID 890). He also told Warren that "he was no longer going to micromanage or have other people come to him . . . because it was causing confusion and a hostile environment." (ECF No. 34-6, PageID 801). But, Warren alleges, his behavior did not change. (ECF No. 34-6, PageID 801–02; ECF No. 36, PageID 890).

4

Five days later, Gottschalk told an employee not to follow Warren's instructions on an assignment. (ECF No. 34-5, Warren Journal, PageID 696–97; ECF No. 36, Response to Motion for Summary Judgment, PageID 890). Warren felt that this "undermin[ed] . . . [her] authority." (ECF No. 34-5, PageID 696). Gottschalk and Warren brought the issue to Rioux, who told them to talk to Sara Paulson, Rioux's supervisor and the Director of Operations for Hollingsworth's USPS contracts. (ECF No. 34-4, Dep. of S. Paulson, PageID 507, 538–40; ECF No. 34-6, Dep. of R. Warren, PageID 803). Paulson said that Warren's instructions were correct, but "[Rioux] said we're just going to do it how [Gottschalk] ha[d] it." (ECF No. 34-6, PageID 803).

In January 2018, Warren was still frustrated at work. She complained to Rioux that "[McKinney] was . . . making up rumors [about her] and being vulgar and very disrespectful," but Rioux did nothing to address the situation. (ECF No. 34-6, Dep. of R. Warren, PageID 806). (In her deposition, Paulson stated that "there was a lot of animosity . . . between [McKinney] and [Warren]. . . . [N]either one wanted to cooperate with the other. It wasn't a one-way street." (ECF No. 34-4, Dep. of S. Paulson, PageID 559).)

Some time between the 6th and the 10th of January, Warren lamented in her journal: "Why is everything I say or do always critiqued, observed, 2nd guessed or ignored. . . . There's a lot of animosity towards me and IDK why . . . ." (ECF No.

34-5, Warren Journal, PageID 714). After that, she "kept going to [Rioux] and letting [Paulson] know what[] [was] going on as far as [she] fe[lt] like there was something going on for [her] gender and [her] race." (ECF No. 34-6, Dep. of R. Warren, PageID 808).  Although she never mentioned gender or race in her journal, she testified that she "did talk to [Rioux] . . . and . . . [Paulson] . . . about [her] race and gender and being treated differently." (ECF No. 34-6, PageID 808). (At their depositions, however, neither Rioux nor Paulson remembered Warren raising these concerns with them. (ECF No. 34-2, Dep. of M. Rioux, PageID 426; ECF No. 34-4, Dep. of S. Paulson, PageID 557–58).)

On January 22, after Warren asked Gottschalk a question, Gottschalk "put her finger up rudely and aggressively and then said, 'What?' like she was bothered with [Warren]." (ECF No. 34-5, Warren Journal, PageID 719; ECF No. 34-6, Dep. of R. Warren, PageID 809). Noting that Gottschalk "didn't treat [McKinney] like that," Warren felt that Gottschalk "was rude to [her] because . . . [she is] a Black female." (ECF No. 34-6, PageID 809). The next day, Rioux told Warren that Gottschalk had some "personal issues outside of work that [were] causing her to not be able to talk or communicate with [Warren] or others." (ECF No. 34-5, PageID 719–20; ECF No. 34-6, PageID 810). Warren felt that she had not been given the same leeway when she lost close family members "because of [her] race and [her] gender." (ECF No.

34-6, PageID 811). But Warren conceded that she had not asked Rioux for any special treatment when those losses occurred. (ECF No. 34-6, PageID 811).

Warren also felt that the delivery drivers were delivering the "good boxes," which were the easiest to process, to "Hispanics and [Rioux]'s favorite people. (ECF No. 34-6, Dep. of R. Warren, PageID 817–19). Warren complained about this to Rioux, who "said he would take care of it, but never did." (ECF No. 34-6, PageID 818). She then complained to Paulson, and also told Paulson that Rioux had previously called Hispanic workers "faster." (ECF No. 34-6, PageID 818–19).

Furthermore, Warren recalled that Rioux once instructed her to attend a meeting with a black woman who had filed a complaint against him with the Post Office for making racially insensitive comments. (ECF No. 34-6, Dep. of R. Warren, PageID 840). Rioux told Warren: "You're both Black and you would probably understand where she's coming from and could probably talk to her about not filing." (ECF No. 34-6, PageID 840).

And Warren alleges that Rioux demonstrated bias on three more occasions. First, he addressed a group of union workers, a majority of whom were black, as "you people." (ECF No. 34-6, Dep. of R. Warren, PageID 837). Warren stated that "there was an uproar after that" and Paulson "c[a]me in for that." (ECF No. 34-6, PageID 837). Second, he told another black woman employee that she could not wear tight pants because black women are "shaped differently." (ECF No. 34-6,

PageID 839). (At his deposition, Rioux remembered only that Hollingsworth had "chang[ed] a policy" to no longer allow *anyone* to wear "yoga pants." (ECF No. 34-2, Dep. of M. Rioux, PageID 422).) Third, he asked Warren if another black employee was her cousin and said that they "look[ed] alike." (ECF No. 34-6, PageID 833). Warren told Rioux that she found this comment "offensive" and explained to him that the other employee's "girlfriend used to work here, and [Warren] called her [Warren's] cousin, but [they] were never really cousins." (ECF No. 34-6, PageID 833). Warren also raised this incident with Paulson, who said they would "have a meeting about it," but they never did. (ECF No. 34-6, PageID 833–34).

In February 2018, Rioux and Paulson created a Performance Improvement Plan ("PIP") for Warren, (ECF No. 34, Motion for Summary Judgment, PageID 174; ECF No. 34-4, Dep. of S. Paulson, PageID 560–61), and on February 15, Rioux discussed the PIP with Warren, (ECF No. 34-6, Dep. of R. Warren, PageID 858). At her deposition, Warren recalled that the PIP said "something about [her] rude speaking and an attitude," and that she wrote "refused to sign" on it because she disagreed with its characterization of her. (ECF No. 34-6, PageID 855–58). Similarly, Shannon Sturm, who was a Human Resources Specialist at Hollingsworth from the summer of 2015 until March 2019, testified that "[t]he only thing specifically that [she] remember[ed] about [Warren's] PIP was really regarding her

unprofessional attitude . . . and [her] inability to increase the productivity in her department." (ECF No. 34-1, Dep. of S. Sturm, PageID 219, 223, 277).

Additionally, Paulson explained at her deposition that Hollingsworth PIPs generally gave recipients 30 to 60 days for improvement, because people "can't turn things around overnight." (ECF No. 34-4, Dep. of S. Paulson, PageID 567).

However, the only PIP produced at this case's depositions was unsigned— and did not include any handwritten notes. (ECF No. 34-5, Performance Improvement Plan, PageID 731–32). And neither Warren, Paulson, nor Roiux was certain that it was the PIP that Rioux had reviewed with Warren. (ECF No. 34-2, Dep. of M. Rioux, PageID 437; ECF No. 34-4, Dep. of S. Paulson, PageID 562; ECF No. 34-6, Dep. of R. Warren, PageID 856–57).

On February 20, after Warren asked McKinney to help her with a floor plan, McKinney "raised [his] voice," swore, and walked away. (ECF No. 34-6, Dep. of R. Warren, PageID 846–47; ECF No. 45-5, Email from J. McKinney to S. Paulson, PageID 3242). Warren recorded this conversation on her phone, because she felt that Rioux and Paulson had never adequately addressed her past complaints about McKinney. (ECF No. 34-6, PageID 846). McKinney told Rioux what happened and Rioux advised him to write it down. (ECF No. 34-1, Dep. of S. Sturm, PageID 286). Pursuant to this advice, McKinney sent an email about the incident to Rioux, with Paulson carbon copied. (ECF No. 45-5, PageID 3242). In the email, he admitted that

he "raised [his] voice" at Warren and claimed that "[Warren] never listen[ed] and only care[d] about the tray area." (ECF No. 45-5, PageID 3242). Then he went home. (ECF No. 34-1, PageID 286; ECF No. 45-5, PageID 3242).

Rioux or Paulson sent Sturm a copy of McKinney's email. (ECF No. 34-1, Dep. of S. Sturm, PageID 280). Rioux also told Sturm that "employees [had] c[o]me to [him] telling [him] that [Warren] [was] walking around the floor talking about [the argument] and [saying] that basically [McKinney] was going to get fired for it." (ECF No. 34-1, PageID 283). And Rioux or Paulson asked Sturm to "come down" to investigate the argument. (ECF No. 34-1, PageID 282–83).

So on February 21, Sturm went to the Temperance warehouse. (ECF No. 34-1, Dep. of S. Sturm, PageID 283). She began her investigation by speaking with Rioux and reviewing (soundless[1]) video footage of the argument. (ECF No. 34-1, PageID 282–84, 316). Then she spoke with Warren, who told her that McKinney had "just bl[own] up on her." (ECF No. 34-1, PageID 284, 289–91). Sturm asked Warren to write a statement, but Warren left to get back to work. (ECF No. 34-1, PageID 289). McKinney did not come in that day. (ECF No. 34-1, PageID 286).

---

[1] Sturm "f[ou]nd out later that there was an audio recording" on Warren's phone. (ECF No. 34-1, PageID 282). But she thinks that she never heard it because Warren "refus[ed] to provide that [to Hollingsworth management]." (ECF No. 34-1, PageID 282).

Next, Sturm began to speak with "the individuals that [had] directly made complaints about the arguments and the comments that were being made on the floor." (ECF No. 34-1, Dep. of S. Sturm, PageID 284). During these discussions, Sturm took notes and procured witness statements. (ECF No. 34-1, PageID 291). She kept her questions "vague," asking employees if they had seen the argument, and then letting their responses guide her follow-up. (ECF No. 34-1, PageID 307).

As Sturm remembers it, the investigation "quickly turned into people making claims against [Warren] and her demeanor and . . . it kind of spiraled from there." (ECF No. 34-1, Dep. of S. Sturm, PageID 284). The investigation "turned into a larger complaint of [Warren]'s behavior." (ECF No. 34-1, PageID 308). "The biggest concern[s]" that Sturm uncovered were about Warren's difficulty with "professionally talking to employees" and her "leaking information out on the floor to employees that was being [discussed] in . . . management meetings." (ECF No. 34-1, PageID 294).

For example, Edward C. wrote that Warren had "tr[i]ed to make [him] feel like [he] was less than her." (ECF No. 34-5, Statement of E. C., PageID 735–37). Wendy Sakovich claimed that "[t]wo times now [Warren] ha[d] come at [her] aggressively." (ECF No. 34-5, Statement of W. Sakovich, PageID 734). And Diane Davis—an African-American female, (ECF No. 34-6, Dep. of D. Davis, PageID

11

860)—reported that she felt Warren was creating a "d[i]vided and "hostile work environment." (ECF No. 34-5, Statement of D. Davis, PageID 738).

Additionally, Davis relayed that another employee, Ryan Patterson, an African-American, had "told [her] that [Warren] told him that [two other employees] were highlighted on a piece of paper stating they were going to be let go first." (ECF No. 34-5, Statement of D. Davis, PageID 738). Sturm testified that Patterson confirmed Davis's account and told her that "[Warren] would confidentially speak to [him] about a number of matters." (ECF No. 34-1, Dep. of S. Sturm, PageID 294, 301). Sturm said that she "got [Patterson's] statement," but no such statement is in the record. (ECF No. 34-1, PageID 294, 315). Neither Davis nor Patterson had management positions, nor were they on Warren's trays team. (ECF No. 34-1, PageID 326). Sturm also testified that Rioux told her that the two employees had been "listed as low performance," but there had not been "any discussion of firing" them. (ECF No. 34-1, PageID 295).

At her deposition, Warren denied sharing confidential information with Patterson. (ECF No. 34-6, Dep. of R. Warren, PageID 860). She also alleged that "[Rioux] told confidential information to Greg" and "[h]e didn't get fired." (ECF No. 34-6, PageID 869). Neither was Patterson disciplined for sharing the information with Davis. (ECF No. 34-1, Dep. of S. Sturm, PageID 303).

After conducting her interviews, Sturm "spoke with [her] manager and [Paulson] as well as [Martha] Chalioux," who was a Vice President of HR (ECF No. 34-1, Dep. of S. Sturm, PageID 293), "and [Rioux] as to the overall consensus of the statements regarding [Warren]'s behavior and . . . the management meeting information that was being disbursed on the floor to specific employees." (ECF No. 34-1, PageID 315–16). They "reviewed the handbook policies and the confidentialities along with any other documentation that [they] could think of . . . addressing." (ECF No. 34-1, PageID 316). Among other provisions, the Employee Handbook—an Acknowledgement of which Warren had signed on her first day at Hollingsworth—states that "[u]nauthorized disclosure or inappropriate use of confidential information will not be tolerated, and is cause for disciplinary action up to and including termination." (ECF No. 34-5, Employee Handbook, PageID 611; ECF No. 34-5, Employee Handbook Acknowledgment, PageID 653–54). Similarly, the Confidentiality Agreement that Warren signed on her first day prohibited her from "disclos[ing] to any person . . . any of the Company's confidential information without written consent of the Company, except . . . on the behalf of the Company in connection with the Company's business." (ECF No. 34-5, Confidentiality Agreement, PageID 609).

Paulson wanted to fire Warren, and Sturm felt that they had sufficient grounds to do so. (ECF No. 34-1, Dep. of S. Sturm, PageID 319–21). So Sturm brought Warren into an office and, according to Sturm, with Paulson and Rioux on the phone:

> [They] reviewed the handbook. [They] reviewed the confidentiality agreement. [They] reviewed [Warren's] position as a whole and stated that it did not seem to be a fit any more between her and the team due to all these violations, due to the demeanor that she was speaking to employees. Obviously there was conflicts. And then her conduct unbecoming a supervisor with releasing privileged information from meetings out onto the company floor.

(ECF No. 34-1, PageID 320). Then Sturm informed Warren "[t]hat [they] were parting ways." (ECF No. 34-1, PageID 320). Two days later, on February 23, Rioux signed an Employee Change Notice indicating that Warren was terminated for "sharing information about the company on the floor." (ECF No. 34-5, Employee Change Notice, PageID 740).

The Employee Change Notice also states that Warren was not replaced. (ECF No. 34-5, Employee Change Notice, PageID 740). Sturm recalled that Rioux and Gottschalk "split the position" after Warren left, (ECF No. 34-1, Dep. of S. Sturm, PageID 274), and Davis testified that McKinney and Gottschalk covered it, (ECF No. 34-3, Dep. of D. Davis, PageID 489). Rioux did not remember hiring anyone to replace Warren, but neither did he remember who, if anyone, took over her work. (ECF No. 34-2, Dep. of M. Rioux, PageID 427).

Subsequently, Sturm, Rioux, and McKinney were all terminated. (ECF No. 34-1, Dep. of S. Sturm, PageID 223; ECF No. 34-2, Dep. of M. Rioux, PageID 424; ECF No. 34-4, Dep. of S. Paulson, PageID 541–43).

**B. Procedural History**

On February 4, 2019, Warren "dual-filed a charge of Race and Sex discrimination and Retaliation with the Michigan Department of Civil Rights and the Equal Employment Opportunity Commission." (ECF No. 15, Amended Complaint, PageID 97). On July 29, 2019, the EEOC sent a Notice to Warren that closed the case and stated:

> Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. . . .
>
> You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed WITHIN 90 DAYS of you receipt of this notice . . . .

(ECF No. 15-1, EEOC Dismissal and Notice of Rights, PageID 104).

Pursuant to that Notice, Warren filed a Complaint against Hollingsworth in this Court on October 24, 2019. (ECF No. 1). On December 13, Warren amended her Complaint. (ECF No. 15). In this First Amended Complaint, Warren alleged that Hollingsworth violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000(e), et. seq., by "subject[ing] [her] to discrimination on the basis of her race

[and sex] by, including but not limited to, subjecting her to unwarranted hyperscrutiny and harassment in the workplace and ultimately terminating her employment." (ECF No. 15, PageID 98–99). She also alleged that Hollingsworth violated Title VII by "t[aking] adverse action against [her] by, including but not limited to, disciplining and terminating [her]" because she "complain[ed] of race and sex discrimination." (ECF No. 15, PageID 101).

On March 26, 2021, Warren and Hollingsworth jointly filed a Stipulated Dismissal of Warren's sex discrimination claim. (ECF No. 33).

Also on March 26, Hollingsworth filed a Motion for Summary Judgment on Warren's remaining claims of race discrimination and retaliation. (ECF No. 34). Warren filed a Response on April 16, (ECF No. 36), and Hollingsworth filed a Reply on July 27,[2] (ECF No. 45). The Court held oral argument on Hollingsworth's Motion on December 21, 2021.

---

[2] Hollingsworth's first Reply, filed on April 23, 2021, (ECF No. 41), was stricken for being too long and containing non-conforming, single-spaced text, (ECF No. 42). Its second Reply, filed on July 23, (ECF No. 43), was again stricken, this time for improper formatting of its exhibits, (ECF No. 44). Hollingsworth's third Reply was accepted and is what the Court refers to above.

## II.    LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able

17

to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## III.   ANALYSIS

### A. The Court will not consider the unauthenticated PIP, but will consider Warren's description of the PIP and the other employees' written complaints about Warren.

**Legal Standard**

Federal Rule of Civil Procedure 56(c)(2) states that, at the summary judgment stage, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

Federal Rule of Evidence 901 provides: "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." An item may be authenticated by "[t]estimony of a [w]itness with [k]nowledge . . . that an item is what it is claimed to be." Fed. R. Evid. 901(b)(1). And some items may be self-authenticated by, among other things, "[a]n inscription, sign, tag, or label purporting to have been affixed in the course of business and indicating origin, ownership, or control." Fed. R. Evid. 902(7).

Additionally, Federal Rule of Evidence 802 establishes that "[h]earsay is not admissible" unless a federal statute, the Rules of Evidence, or "other rules prescribed by the Supreme Court" provide otherwise. Per Rule of Evidence 801, a statement qualifies as "hearsay" only if "(1) the declarant does not make [it] while testifying at the current trial or hearing; and (2) a party offers [it] in evidence to prove the truth

19

of the matter asserted in the statement." Therefore, company files, including employee statements, that are offered to prove a company's "knowledge and motives in . . . terminating" an employee, rather than to prove the absolute truth of statements in the files, are not hearsay. *Nemeth v. Citizens Fin. Grp.*, No. 08-cv-15326, 2012 WL 13198096, at *3 (E.D. Mich. Aug. 13, 2012) (citing *Mayday v. Public Libraries of Saginaw*, 480 F.3d 815, 819–20 (6th Cir. 2007) and *Brauninger v. Motes*, 260 F. App'x 634, 636–38 (5th Cir. 2007)).

**Arguments**

Warren argues that Hollingsworth "rel[ies] exclusively on hearsay evidence to support [its] alleged legitimate, nondiscriminatory reasons for terminating [her] employment." (ECF No. 36, Response to Motion for Summary Judgment, PageID 897). Specifically, Warren claims that "the PIP presented by [Hollingsworth] . . . has not been authenticated" because it is not signed—nor labelled with "refused to sign"—and neither Rioux nor Paulson could "identify [it] as the PIP that was actually created or . . . given to Warren." (PageID 898). Furthermore, Warren contends that the PIP's contents are inadmissible hearsay because Paulson "authored the PIP . . . based upon . . . whatever Rioux told her." (PageID 898–99) (citing *Black v. Nestle USA, Inc.*, 694 F.3d 571, 577 n.1 (6th Cir. 2012)).

Next, Warren argues that the written employee complaints about her that Sturm collected on the day that she was fired "are hearsay, because they are

20

statements made to Sturm . . . offered to prove the truth of the matters asserted, including that Warren 'leaked' confidential management information." (ECF No. 36, PageID 899–900). Warren also objects to Davis's statement because, when Davis "wrote that Warren was 'leaking information,'" she was merely "relaying what . . . Patterson[] had told her." (PageID 900) (citing *United States v. Blackwell*, 459 F.3d 739, 755 (6th Cir. 2006)).

In its Reply, Hollingsworth argues that a company's investigation file "'is not hearsay and is admissible'" "'to the extent that the statements [in it] are being offered not to prove the truth of what any of the employees stated or recited, but rather to prove the company's basis for the actions it took.'" (ECF No. 45, Reply to Motion for Summary Judgment, PageID 2708) (quoting *Nemeth*, 2012 WL 13198096, at *3 (internal alteration omitted)). Additionally, Hollingsworth asserts that "an investigative file, 'prepared and kept in the regular course of business, offered to prove the company's knowledge or motive, qualify as business records and are admissible under Fed. R. Evid. 803(6).'" (PageID 2708) (quoting *Nemeth*, 2012 WL 13198096, at *3).

**Analysis**

The Court will not consider the PIP because it has not been authenticated. *See* Fed. R. Evid. 901. Neither Warren, Paulson, nor Rioux could verify the PIP's authenticity at their depositions. (ECF No. 34-2, Dep. of M. Rioux, PageID 437;

ECF No. 34-4, Dep. of S. Paulson, PageID 562; ECF No. 34-6, Dep. of R. Warren, PageID 856–57). And the PIP is not self-authenticated by "[a]n inscription, sign, tag, or label." Fed. R. Evid. 902(7).

Nonetheless, the Court finds that Hollingsworth did create a PIP that referenced Warren's "rude speaking and an attitude," because Warren admitted at her deposition that she had been shown such a PIP and discussed it with her Hollingsworth Supervisors. (ECF No. 34-6, Dep. of R. Warren, PageID 855–58). *See* Fed. R. Evid. 1007 ("The proponent may prove the content of a writing, recording, or photograph by the testimony, deposition, or written statement of the party against whom the evidence is offered. The proponent need not account for the original."). The Court also recognizes that Warren has testified that she objected to the characterization of her in the PIP. (ECF No. 34-6, PageID 855–58).

Additionally, the Court will consider the employee statements written on the day of Warren's firing. These statements are not hearsay because they are not offered to prove the truth of the matters asserted within them. *See Nemeth*, 2012 WL 13198096, at *3. Rather, they are offered to show what evidence Hollingsworth's management considered when it decided to fire Warren. Indeed, this case is not about whether Warren deserved to be fired; it is about whether Hollingsworth fired her because of her race or her complaints of unlawful discrimination.

**B. As to Warren's claim of spoliation, the Court will not infer that Patterson's statement favored Warren.**

**Legal Standard**

"[A] proper spoliation sanction should serve both fairness and punitive functions." *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009). To meet this goal, a district court has "broad discretion in imposing sanctions based on spoliated evidence." *Id.* at 653; *see also Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 516 (6th Cir. 2014) ("[W]e have declined to impose bright-line rules, leaving it instead to a case-by-case determination whether sanctions are necessary, and if so, what form they must take."). Such sanctions may include "dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence." *Adkins*, 554 F.3d at 653. "[T]he severity of a sanction may . . . correspond to the party's fault." *Id.* at 652–53.

In *Adkins*, the Sixth Circuit highlighted a more concrete standard for courts deciding whether to draw an adverse inference based on evidence spoliation:

> A party seeking an adverse inference [jury] instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; *and* (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. Thus, an adverse inference for evidence spoliation is appropriate if the Defendants knew the evidence was relevant to some issue at trial and their culpable conduct resulted in its loss or destruction. This depends on the alleged spoliator's mental

23

state regarding any obligation to preserve evidence and the subsequent
destruction.

*Adkins v. Wolever*, 692 F.3d 499, 503–04 (6th Cir. 2012) (quoting *Beaven v. U.S.
Dep't of Just.*, 622 F.3d 540, 553–54 (6th Cir. 2010)) (emphasis added in *Adkins*);
*see also Lemmon v. City of Akron, Ohio*, 768 F. App'x 410, 421 (6th Cir. 2019)
(quoting the above when deciding whether a district court erred by not granting an
adverse inference based on evidence spoliation at the summary judgment—rather
than jury instruction—stage). But, in the same case, the Sixth Circuit went on to
reiterate that, ultimately, it would "leave the determination of the propriety of a
spoliation sanction to the discretion of the district court, considering the facts of each
case individually." *Adkins*, 692 F.3d at 506–07; *see also Clay v. United Parcel Serv.,
Inc.*, 501 F.3d 695, 712 (6th Cir. 2007) (noting that one "general rule is that where
relevant information is in the possession of one party and not provided, then an
adverse inference *may* be drawn that such information would be harmful to the party
who fails to provide it" (emphasis added) (internal citations, quotation marks, and
alterations omitted)).

**Arguments**

Without citing any case law, Warren asserts in her Response that because Sturm
testified that Patterson wrote a statement, and Hollingsworth "failed to produce" it,
"[t]he reasonable inference is that [Patterson] dispute[d] what Davis sa[id]." (ECF

24

No. 34-1, Dep. of S. Sturm, PageID 315; ECF No. 36, Response to Motion for Summary Judgment, PageID 900).

Hollingsworth does not directly respond to this point in its Reply, but the Statement of Facts in its Motion for Summary Judgment relays Sturm's testimony that she "spoke with [Patterson] and got his statement regarding the specific information that [Warren] was leaking." (ECF No. 34, Motion for Summary Judgment, PageID 176) (quoting ECF No. 34-1, Dep. of S. Sturm, PageID 294–95). And, at the end of oral argument, Hollingsworth's counsel stated that Warren never subpoenaed Patterson.

**Analysis**

The Court declines to grant the adverse inference that Warren requests. Drawing this inference would be unduly punitive. Warren has not suggested that Hollingsworth had an obligation to preserve Patterson's statement at the time it was lost or destroyed, that Hollingsworth intentionally or even negligently destroyed the statement, that Hollingsworth has the statement and refuses to provide it, nor that Hollingsworth lost or destroyed any other pieces of evidence. Also, Warren has not stated that she has attempted to subpoena Patterson or to solicit his testimony in any other way.

Drawing the inference would also be unduly speculative, because it is entirely unsupported by the record. Sturm and Davis testified that Patterson *confirmed*

25

Davis's report. (ECF No. 34-1, PageID 294, 301). And even Warren did not testify that Patterson disputed it.

Still, in the interest of fairness, the Court will not, at this stage in which the facts should be viewed in the light most favorable to Warren, credit the testimony that Patterson confirmed Davis's report. The Court will simply not consider Patterson's alleged written statement, nor his alleged discussion with Sturm, at all— but it will continue to consider Davis's statement about what Patterson told *her*.

## C. Hollingsworth is entitled to summary judgment on Warren's race discrimination claim.

Title VII provides that "[i]t shall be an unlawful practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e–2(a). To establish a claim under this provision, a "plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 252–53 (1981). "[I]f the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's [treatment].'" *Id.* at 253 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). And if the defendant does so, the burden shifts back to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true

26

reasons, but were a pretext for discrimination." *Id.* "Throughout this burden-shifting approach, the plaintiff continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

A plaintiff can prove a prima facie case of discrimination based on an adverse employment action in two ways. First, she can "present[] credible, direct evidence of discriminatory intent." *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 n.4 (6th Cir. 1992). Second, she can "show that 1) [s]he is a member of a protected class; 2) [s]he was qualified for the job and performed it satisfactorily; 3) . . . [s]he suffered an adverse employment action; and 4) [s]he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of h[er] protected class. *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014).

Hollingsworth is entitled to summary judgment on this claim because, considering the undisputed facts in this case, no jury could reasonably find a prima facie case of discrimination. Warren has not argued that she has "direct evidence of discriminatory intent." *Mitchell*, 964 F.2d at 582 n.4; (ECF No. 36, Response to Motion for Summary Judgment, PageID 901). And she cannot establish that

27

Hollingsworth replaced her with a person of a different race, nor that Hollingsworth treated her less favorably than a similarly situated person of a different race.

### 1. No jury could reasonably find that Hollingsworth replaced Warren with a person of a different race.

**Legal Standard**

In *Grosjean*, the Sixth Circuit held that "[a] 'person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.'" *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)) (also citing *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992)); *see also Dekarske*, 294 F.R.D. at 83 ("[T]he evidence demonstrates that Dekarske's position was never filled and that other then-existing FedEx employees absorbed his route. [Thus,] Dekarske has not created a genuine issue of fact that he was 'replaced' . . . .").

**Arguments**

Hollingsworth's Motion for Summary Judgment does not address the possibility that Warren was replaced. But, in her Response, Warren argues that "a genuine issue of material exists as to whether [she] was replaced" because the area that she supervised was very busy and Rioux "d[id] not remember how Warren's

28

area was covered after her departure." (ECF No. 36, Response to Motion for Summary Judgment, PageID 903). Warren also asserts that, under *Michas* and *Bellaver*, from the Seventh Circuit, "[t]he Court should . . . consider . . . that Warren's duties may have been distributed after her termination to Supervisors Gottschalk and McKinney, who are not black." (ECF No. 36, PageID 905–06) (citing *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 693 (7th Cir. 2000) and *Bellaver v. Quanex Corp.*, 200 F.3d 485, 496 (7th Cir. 2000)).

In its Reply, Hollingsworth argues that *Michas* and *Bellaver* apply only to "reductions of force," and that they do not apply in this case because there "is no allegation or evidence [that Hollingsworth] desired to eliminate [Warren]'s position to move to a two-supervisor system to recharacterize her termination *for cause* as a reduction in force." (ECF No. 45, Reply to Motion for Summary Judgment, PageID 2710). Hollingsworth concludes: "[Warren] was not replaced, her position was not filled and was merely absorbed by the remaining employees, which does not constitue 'replacement.'" (PageID 2710) (citing *Dekarske*, 294 F.R.D. at 83; *Barnes*, 896 F.2d at 1465; and *Garrett v. Sw. Med. Clinic PC*, No. 13-cv-634, 2014 WL 7330947, at *6 (W.D. Mich. Dec. 19, 2014)).

**Analysis**

Warren was not replaced. Even taking the facts in the light most favorable to Warren, there is no genuine dispute that her duties were "redistributed" among

Hollingsworth's remaining employees after she left. Sturm and Davis both testified to this fact,[3] and Warren's Employee Change Notice confirmed it. (ECF No. 34-1, Dep. of S. Sturm, PageID 274; ECF No. 34-3, Dep. of D. Davis, PageID 489; ECF No. 34-5, Employee Change Notice, PageID 740). Rioux's inability to remember what happened, (ECF No. 34-2, Dep. of M. Rioux, PageID 427), is not "sufficient probative evidence" for a reasonable jury to find otherwise, especially because he remembers so little of any events in this case. *Arendale*, 519 F.3d at 601.

Accordingly, this case falls squarely under *Grosjean*: because Warren's work was "redistributed," she was not "replaced." *Grosjean*, 349 F.3d at 336. *Michas* and *Bellaver* cannot muddle this result because they were decided before *Grosjean* and in a different circuit.

### 2. No jury could reasonably find that Hollingsworth treated Warren less favorably than a similarly situated person of a different race.

**Legal Standard**

Even though Warren was not replaced, she could still prove a prima facie case of discrimination by "show[ing] that [s]he was similarly situated in all relevant respects to an employee of a different race who was treated better." *Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019) (internal citations and

---

[3] Sturm and Davis agreed that Gottschalk covered some of Warren's work. And though their recollections of who else absorbed the work differed—Sturm mentioned Rioux; Davis thought McKinney—neither pointed to a new hire, nor suggested that anyone was completely reassigned.

quotation marks omitted). When deciding if employees were "similarly situated," this Court generally considers whether the employees "[(1)] dealt with the same supervisor, [(2)] [were] subject to the same standards, and [(3)] [] engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583. Depending on the facts of the case, "the weight [of] each factor can vary," *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003), and "other factors may also be relevant," *Johnson*, 942 F.3d at 331. *See also Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) ("Courts should not assume, however, that the specific factors discussed in *Mitchell* are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee.").

On the third *Mitchell* factor, the Court "look[s] to whether the comparators' actions were of comparable seriousness to the conduct for which [the] Plaintiff was discharged" or subject to an adverse employment action. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 777 (6th Cir. 2016) (internal citations and quotation marks omitted). This factor accounts for the fact that "a plaintiff cannot establish a reasonable inference of discriminatory motive based on her employer's more severe treatment of more egregious circumstances." *Id.* Therefore, the Court

examines the plaintiff and comparators' conduct and surrounding circumstances from the perspective of the employer at the time it took the adverse action. *See Oliver v. St. Luke's Dialysis LLC*, 491 F. App'x 586, 588 (6th Cir. 2012) (holding that a proposed comparator did "not qualify as similarly situated because no evidence suggest[ed] his supervisor ever knew about the" conduct that was allegedly comparable to that of the plaintiff); *Laney v. Ohio Dep't of Youth Servs.*, 448 F. App'x 553, 556 (6th Cir. 2011) ("[Plaintiff] can hardly fault her employer for not meting out discipline for infractions it did not know about.").

**Arguments**

Hollingsworth claims that "there are only two individuals who were similarly situated to [Warren]: [] Gottschalk and [] McKinney." (ECF No. 34, Motion for Summary Judgment, PageID 185). And Hollingsworth argues that these two were not treated "more favorably" than Warren, because, when Warren was fired, only she was on a PIP, was "the aggressor" in the confrontation with McKinney, and was reported to have "belittled her subordinates" and, significantly, "disclosed confidential management information." (PageID 185–86).

Warren agrees that Gottschalk and McKinney were the relevant "similarly-situated employees" here. (ECF No. 36, Response to Motion for Summary Judgment, PageID 904). But she asserts that they were treated better than she was. (PageID 904). Warren states that "Rioux allowed Gottschalk to treat Warren as if

32

she did not exist" because of Gottschalk's "personal issues," and "Rioux also sided with Gottschalk when she told an order filler to disobey instruction that Warren had given." (PageID 904). Further, Warren contends that "no investigation or discipline of McKinney ever ensued" after their confrontation (and Warren's complaints about him), and instead Warren was fired "without even [having] a chance to defend herself." (PageID 904–05).

Hollingsworth replies that Warren's "behavior was not comparable to her similarly situated supervisors as there is no allegation or testimony they acted similarly." (ECF No. 45, Reply to Motion for Summary Judgment, PageID 2712) (citing *Ercegovich*, 154 F.3d at 352). It notes that "Gottschalk specifically requested [] Rioux's assistance while she was experiencing personal issues," while Warren "never made any similar requests." (PageID 2711) And it points out that McKinney was not "already on a PIP for being rude and condescending," and McKinney— unlike Warren—"complied in preparing a written statement" about their confrontation. (PageID 2711).

**Analysis**

Warren has not shown that Hollingsworth treated Gottschalk or McKinney better than her in a situation where they were "similarly situated in all relevant respects." *Johnson*, 942 F.3d at 331. First, because she never asked for accommodations for "personal issues," (ECF No. 34-6, Dep. of R. Warren, PageID

811), Warren cannot prove that she would not have received the same leeway to disengage as Gottschalk did. Next, Warren does not have any firsthand knowledge or admissible evidence to support her assertion that Sturm did not investigate McKinney after their confrontation. In fact, the record suggests otherwise: at least two of the statements that Sturm collected focus exclusively on the confrontation and its aftermath. (ECF No. 45-5, Statement of A. O., PageID 3249; ECF No. 45-5, Statement of E. B., PageID 3250). And Sturm testified that she did not prompt any employees to speak about anything besides the confrontation; it was the employees who chose to focus on Warren's behavior. (ECF No. 34-1, Dep. of S. Sturm, PageID 307).[4]

Finally, neither Gottschalk nor McKinney engaged in conduct of "comparable seriousness" to that for which Warren was fired. At the time it fired Warren, Hollingsworth had placed her on a (albeit disputed) PIP for "rude speaking and an attitude." (ECF No. 34-6, Dep. of R. Warren, PageID 855–58). More importantly, Hollingsworth's management had just received statements from employees that complained of Warren "try[ing] to make [them] feel like [they] [were] less than her," acting "aggressively," and creating a "hostile work environment." (ECF No. 34-5, Statement of E. C., PageID 735–37; ECF No. 34-5, Statement of W. Sakovich,

---

[4] Moreover, McKinney was not on a PIP at the time of the investigation. So even if Sturm had deliberately paid extra attention to Warren, she would have had good reason to do so.

PageID 734; ECF No. 34-5, Statement of D. Davis, PageID 738; ECF No. 34-6, Dep. of R. Warren, PageID 855–58). And Hollingsworth had also just received a report from Davis stating that Warren had been leaking management's employee evaluations and (purported) plans to fire employees. (ECF No. 34-5, Statement of D. Davis, PageID 738). This was a serious offense that was likely to cause drama on the floor, and it was also a breach of the Employee Handbook's prohibition on "inappropriate use of confidential information," (ECF No. 34-5, Employee Handbook, PageID 611), and the Confidentiality Agreement's prohibition on "disclos[ing] to any person . . . any of the Company's confidential information without written consent of the Company." (ECF No. 34-5, Confidentiality Agreement, PageID 609). Adding to the credibility of Davis's report, Rioux confirmed that the employees allegedly identified were in fact "listed as low performance." (ECF No. 34-1, Dep. of S. Sturm, PageID 295).

Although Warren denied leaking information at her deposition, she does not allege that she denied it to Hollingsworth before it fired her. Perhaps, in the interest of fairness, Hollingsworth should have given Warren an opportunity to explain herself before taking such severe action. But, as Hollingsworth's counsel noted at oral argument, Hollingsworth was not reluctant to fire its employees, as evinced by its subsequent firings of McKinney, Rioux, and Sturm. What is relevant here is only that Warren had not given Hollingsworth reason to doubt Davis's report before it

fired it her. *See Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 890 (6th Cir. 2020) ("Terminating an employee only because of complaints from her subordinates—without investigating the merits of those complaints—may be unwise, but that's not the question here."). Quite the opposite: Warren's behavior had been an issue in the past, and nothing in the record suggests that Hollingsworth had any reason to question Davis's honesty. *See also* (ECF No. 34-3, Dep. of D. Davis, PageID 472 (reflecting Davis's testimony that she was never written up by Warren nor McKinney)).

In contrast, Hollingsworth had not placed either Gottschalk or McKinney on a PIP, had not received any employee-complaints about their behavior, and had not received any reports that they had disclosed confidential information. Thus, from Hollingsworth's point of view, Gottschalk and McKinney were not "similarly situated" to Warren.

### D. Hollingsworth is entitled to summary judgment on Warren's retaliation claim.

Title VII also provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). The same burden shifting framework outlined above also applies here: if Warren "makes out a prima facie case" of retaliation, then Hollingsworth "bears the burden of articulating a legitimate, non-retaliatory reason for its action." *Briggs*

36

*v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021). If Hollingsworth does that, "the burden shifts [back] to [Warren] to demonstrate that the proffered reason is actually a pretext to hide unlawful retaliation." *Id.* (internal citation and quotation marks omitted).

Here, a reasonable jury might be able to find a prima facie case of retaliation. But even assuming that is so, Hollingsworth is entitled to summary judgment on this claim because it has articulated a legitimate reason for firing Warren and no jury could reasonably find that that reason is a pretext for retaliation.

### 1. A reasonable jury might be able to find a prima facie case of retaliation.

**Legal Standard**

"To establish a prima facie case of retaliation, a plaintiff must establish that [] (1) [she] engaged in a protected activity; (2) h[er] exercise of such protected activity was known by the defendant; (3) the defendant subsequently took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Briggs*, 11 F.4th at 514 (internal citation and quotation marks omitted).

A plaintiff engages in protected activity by opposing any employment practice that she reasonably and in good faith believes is unlawful. *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 344–46 (6th Cir. 2021). A plaintiff's opposition need not "be lodged with absolute formality, clarity, or precision." *Stevens v. Saint*

*Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 631 (6th Cir. 2013). Rather, "[t]he opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." *Laster*, 746 F.3d at 730. [P]rotected activity" may include "complaining *to anyone* (management, unions, other employees, or newspapers) about allegedly unlawful practices." *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1067–68 (6th Cir. 2015) (emphasis added) (internal citations and quotation marks omitted) (adding that "it would be unfair to read into the provision a requirement that a complainant only engages in protected activity when s/he opposes the harassment to a particular official designated by the employer"); *see also Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579–80 (6th Cir. 2000) ("[T]here is no qualification on who the individual doing the complaining may be or on the party to whom the complaint is made known—i.e., the complaint may be made by anyone and it may be made to a co-worker, newspaper reporter, or anyone else about alleged discrimination against oneself or others . . . .").

However, "'[a] vague charge of discrimination' does not constitute protected activity under Title VII." *Love v. ProQuest, LLC*, No. 18-10455, 2019 WL 721955, at *4 (E.D. Mich. Feb. 20, 2019) (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)). Accordingly, this Court and the Sixth Circuit have found complaints to be unprotected when they do not mention a

protected class. *See Love*, 2019 WL 721955, at *5 ("In order for Love's complaints to be deemed protected activity under Title VII, Love had to go beyond general claims of unequal treatment and specifically complain about race discrimination."); *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 592 (6th Cir. 2007) (holding that a complaint was not protected activity because "there [was] simply no evidence in the record that [the plaintiff] told [his manager] that he had been discriminated against *on the basis of his age*" (emphasis added)). These courts have also found complaints to be unprotected when they refer to a single remark that does not evince an employment *practice*. *See Childers v. Gen. Motors LLC*, No. 16-14428, 2019 WL 630274, at *7 (E.D. Mich. Feb. 14, 2019) (finding that registering an "isolated complaint" about a single "racist remark" was not a protected activity); *Booker*, 879 F.2d at 1313 (holding that a complaint was not protected activity where "the allegation [was] not that [the employer] [was] engaging in [an] unlawful employment practice, but that one of its employees ha[d] a racial intolerance").

Additionally, for a plaintiff's opposition to be protected, the plaintiff "must have [had] a reasonable and good faith belief that the opposed practices were unlawful." *Jackson*, 999 F.3d at 345. A plaintiff can meet this standard "whether or not the challenged practice ultimately is found to be unlawful." *Johnson*, 215 F.3d at 579–80. "The reasonableness of the employee's belief will depend on the totality of the circumstances known (or reasonably albeit mistakenly perceived) by the

employee at the time of the complaint, analyzed in light of the employee's training and experience." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 647 (6th Cir. 2015) (internal citations and quotation marks omitted). And "the issue of objective reasonableness should be decided as a matter of law only when no reasonable person could have believed that the facts known to the employee amounted to a violation or otherwise justified the employee's belief that illegal conduct was occurring." *Id.* (internal citations and quotation marks omitted).

The EEOC Guidance on Retaliation, to which courts afford "great deference," offers the following example of a reasonable belief of discrimination:

> An employee complains to her office manager that her supervisor failed to promote her because of her sex after an apparently less qualified man was selected. Because the complaint was based on a reasonable good faith belief that discrimination occurred, she has engaged in protected opposition regardless of whether the promotion decision was in fact discriminatory.

*Enforcement Guidance on Retaliation and Related Issues*, EEOC (Aug. 25, 2016), https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues#c._Opposition [https://perma.cc/5HZ2-K4QS]; *Johnson*, 215 F.3d at 579 n.8 ("Pursuant to the Supreme Court's directive, the EEOC's interpretation of Title VII is to be given "great deference" by the courts." (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 434 (1971)); *see also Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 179 (2011) (Ginsburg, J., concurring) ("The EEOC's statements in the

40

[Compliance] Manual merit deference under *Skidmore v. Swift & Co.*, 323 U.S. 134

[] (1944).”). Furthermore, the Guidance explains:

> [E]ven reporting an isolated single incident of harassment is protected
> opposition if the employee reasonably believes that a hostile work
> environment is in progress, with no requirement for additional evidence
> that a plan is in motion to create such an environment or that such an
> environment is likely to occur. Likewise, it is protected opposition if
> the employee complains about offensive conduct that, if repeated often
> enough, would result in an actionable hostile work environment.

*Enforcement Guidance*, *supra* (internal citations and quotation marks omitted)

(noting earlier that “the hostile work environment liability standard is predicated on

encouraging employees to report harassing conduct *before it becomes severe or

pervasive*” (emphasis original) (internal citation and quotation marks omitted)).

But a plaintiff fails to meet the standard if her opposition was “based on an

unreasonable mistake of law,” or if it was “so devoid of factual support as to be

patently unreasonable.” *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th

Cir. 2012); *see also Spiteri v. AT & T Holdings, Inc.*, 40 F. Supp. 3d 869, 876 (E.D.

Mich. 2014) (“It is presumed that the employee has substantive knowledge of the

law when applying the objective test.” (internal citation, alteration, and quotation

marks omitted)). For example, in *Breeden*, the Supreme Court held that a respondent

employee had not engaged in protected opposition when she complained about the

following incident:

> [R]espondent’s male supervisor met with respondent and another male
> employee to review the psychological evaluation reports of four job

41

> applicants. The report for one of the applicants disclosed that the applicant had once commented to a co-worker, "I hear making love to you is like making love to the Grand Canyon." At the meeting respondent's supervisor read the comment aloud, looked at respondent and stated, "I don't know what that means." *Ibid.* The other employee then said, "Well, I'll tell you later," and both men chuckled.

*Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 269 (2001). The Court reasoned that "[n]o reasonable person could have believed that the single incident recounted above violated Title VII's standard [for sex discrimination]. . . . [Rather, it was] an isolated incident that cannot remotely be considered 'extremely serious,' as our cases require." *Id.* at 271.

## Arguments

Hollingsworth argues that it is entitled to summary judgment on Warren's retaliation claim because "there is no evidence [Warren] engaged in a protected activity." (ECF No. 34, Motion for Summary Judgment, PageID 191) (citing, among other cases, *Johnson*, 215 F.3d at 580). Hollingsworth maintains that "there is absolutely no evidence that any of the alleged harassment of which [Warren] complained occurred." (PageID 191). And it asserts that "there is no record of [Warren] ever reporting, complaining of, and/or opposing any alleged discrimination," except for when Warren "ma[d]e such a complaint to [] Sturm . . . *after* [she was] terminated." (PageID 191–92). Finally, Hollingsworth notes that "[t]here can be no causal connection where the adverse employment action precedes the protected activity." (PageID 192).

42

Warren responds that "[t]he anti-retaliation protection allows that an employee's complaints to management of discriminatory employment practices are 'protected activity.'" (ECF No. 36, Response to Motion for Summary Judgment, PageID 910) (citing *Laster*, 746 F.3d at 730 and *Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*, 495 F. App'x 651, 655 (6th Cir. 2012)). She states that she "verbally reported her disparate treatment concerns to Rioux and Paulson in November 2017 and thereafter." (PageID 911). And she provides the following list of her complaints:

1) She complained verbally to Rioux about being undermined on the basis of her gender, as there was a male employee who would not take direction from her.

2) In December 2017, Warren complained to Rioux about his undermining of her authority, and he admitted to underestimating her as a "young, black, petite female."

3) On Jan. 8, 2018, Warren complained to Rioux and Paulson specifically about being treated differently as a Supervisor on account of her race and gender. This conversation was documented contemporaneously in Warren's journal.[5] Defendants did not investigate her complaint.

4) On Jan. 22, 2018, Warren complained to Rioux about Gottschalk being rude to her. Rioux permitted Gottschalk to stop talking to Warren.

5) Finally, on Feb. 20, 2018, Warren recorded an interaction with McKinney where he was dismissive, rude, and vulgar in response to her, on the floor in front of other employees. Warren complained immediately to Rioux, who called HR to "investigate."

---

[5] But, the Court notes, the journal entry did not mention race or gender. (ECF No. 34-5, Warren Journal, PageID 714).

43

(PageID 911) (bullet points replaced with numbers). Warren then argues that "a reasonable jury could conclude a causal connection" between her complaints and her termination, in part because they occurred so close in time. (PageID 911–12) (citing *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 615 (6th Cir. 2019)).

Hollingsworth replies that "[g]eneric complaints of feeling singled out and treated unequally, without specifically complaining the unequal treatment is on the basis of race, are insufficient under Title VII." (ECF No. 45, Reply to Motion for Summary Judgment, PageID 2713) (citing, among other cases, *Love*, 2019 WL 721955, at *4–5, and *Childers*, 2019 WL 630274, at *6–7). Therefore, Hollingsworth argues, "[Warren]'s vague complaints and statements about 'micromanaging' do not reach the level of a complaint of protected activity," and "Rioux's apology regarding his perception (not his actions) is at best a stray remark and do[es] not reflect a response to protected activity." (PageID 2713). Hollingsworth also states that Warren "acknowledges [she] never made a written complaint of race discrimination, never escalated a situation to HR, and never made a single notation in her personal journal regarding 'discrimination.'" (PageID 2713). Finally, Hollingsworth contends that Warren "submitted no affirmative evidence of causation." (PageID 2714).

**Analysis**

The second, fourth, and fifth complaints on Warren's list are not protected activity, because they are merely "vague" charges of rudeness and disrespect, and they do not mention race, sex, or any other category protected by Title VII. *See Fox*, 510 F.3d at 592; *Love*, 2019 WL 721955, at *5. Although Warren alleges that Rioux "admitted to underestimating her as a 'young, Black, petite female'" in response to the second complaint, she does not allege that *she* commented then on her age, race, or sex. (ECF No. 34-6, Dep. or R. Warren, PageID 801).

The first complaint is a closer call, but it is also not protected activity, because it is not about an employer *practice*. *See Booker*, 879 F.2d at 1313; *Childers*, 2019 WL 630274, at *7. As alleged, Warren was merely objecting to a single employee's sexist insubordination; she was not suggesting that there was a sexist environment at the Temperance plant, nor that Hollingsworth had condoned the employee's sexism or separated employees based on sex. In fact, at the time of Warren's complaint, Hollingsworth had recently placed Warren in charge of the employee, directly contradicting his claim that "women [shouldn't] have authority over [men]." (ECF No. 34-6, Dep. of R. Warren, PageID 798). And Warren does not allege that she complained in this instance about Rioux "sid[ing] with" the employee. (ECF No. 34-6, PageID 798).

On the other hand, Warren's third listed complaint is neither too vague nor too isolated to be protected activity. Here, Warren alleges that she spoke to Rioux and Paulson about her "*race and gender*[6] and being treated differently."[7] (ECF No. 34-6, Dep. of R. Warren, PageID 808) (emphasis added). This phrasing explicitly invokes race and sex. *Cf. Fox*, 510 F.3d at 592; *Love*, 2019 WL 721955, at * 5. And "being treated differently," in context, clearly means "being treated worse." Indeed, around the time of this complaint, Warren wrote in her journal: "everything I say or do [is] always critiqued, observed, 2nd guessed or ignored. . . . There's a lot of animosity towards me . . . ." (ECF No. 34-5, Warren Journal, PageID 714). Further,

---

[6] Although the parties have stipulated out Warren's gender discrimination claim, they did not stipulate out any reliance on gender from her *retaliation* claim. Thus, the Court can consider the gender portion, in addition to the race portion, of this complaint.

[7] Because at this stage it must view the facts in the light most favorable to Warren, the Court credits Warren's deposition testimony asserting that this happened, *see* (ECF No. 34-6, Dep. of R. Warren, PageID 808), even though neither Rioux nor Paulson remembered it at their depositions, (ECF No. 34-2, Dep. of M. Rioux, PageID 426; ECF No. 34-4, Dep. of S. Paulson, PageID 557–58), and the journal produced by Warren makes no mention of race or gender. *See Perry*, 353 F.3d at 513 ("In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party."); *McCowan v. Penske Truck Leasing Corp.*, No. 05-73239, 2007 WL 541924, at *12 (E.D. Mich. Feb. 16, 2007) ("Although the only support for Plaintiff's claim of sabotage is his own testimony, Plaintiff's testimony is evidence which must be construed in his favor."). *But see Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087–88 (6th Cir. 1996) ("[W]here the record taken as a whole could not lead a rational trier of fact to find for the respondent, [a] motion [for summary judgment] should be granted. The trial court has at least some discretion to determine whether the respondent's claim is implausible." (internal citation and quotation marks omitted)).

the complaint is not restricted to one remark, one incident, or one person. Thus, it apparently opposes an employer *practice* of treating Warren worse at work because of her protected characteristics. *Cf. Booker*, 879 F.2d at 1313; *Childers*, 2019 WL 630274, at *7.

And Warren's submitting the complaint verbally to her managers was enough; she did not need to submit it in writing or to HR for it to be protected activity. *See Laster*, 746 F.3d at 730; *New Breed Logistics*, 783 F.3d at 1067–68.

The last question, then, is whether Warren had a "reasonable and good faith belief that the opposed practices were unlawful" when she made the complaint. *Johnson*, 215 F.3d at 579–80. Warren's testimony and case filings suggest that she held this belief in good faith, and the "question of [her] credibility[] must be left to a jury." *Montell v. Diversified Clinical Services, Inc.*, 757 F.3d 497, 505 (6th Cir. 2014).

But the determination of whether her belief was reasonable is less clear-cut. In her testimony, Warren alleges that, before she made this third complaint, Rioux had: told Warren that "Hispanics work faster," (ECF No. 34-6, Dep. of R. Warren, PageID 762); allowed a male employee to report to him instead of Warren because the employee did not want to report to a woman, (ECF No. 34-6, PageID 798); "apologize[d] to [Warren]" for "understimat[ing] [her] ability as a supervisor" because she was "a young, Black, petite female," (ECF No. 34-6, PageID 801); and

47

continued to micromanage her after this apology, (ECF No. 34-6, PageID 800–01). Warren also alleges that Rioux had sided with Gottschalk over Warren in a disagreement, even though Paulson thought that Warren's view was the "correct" one, (ECF No. 34-4, Dep. of S. Paulson, PageID 507, 538–40; ECF No. 34-6, PageID 803), and that Rioux had done nothing to address McKinney's mistreatment of Warren, (ECF No. 34-6, PageID 806).[8]

None of these incidents was an "adverse employment action" because none of them "'constitute[d] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Laster*, 746 F.3d at 727 (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998)). And, even all together, these incidents would not have created a "workplace [that was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [Warren]'s employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted); *Vitt v. City of Cincinnati*, 97 F. App'x 634, 638 (6th Cir. 2004) (holding that where the plaintiff was "not physically threatened

---

[8] Although Rioux did not remember these incidents at his deposition, Hollingsworth has not presented any evidence showing that it is beyond dispute that the incidents did not occur.

or humiliated" and could "perform her job," "infrequent and isolated" "comments referencing race" did not create a hostile work environment).

Nonetheless, these incidents may have been enough to give Warren a reasonable belief that "a hostile work environment was *in progress*." *Enforcement Guidance*, *supra* (emphasis added) (internal citations and quotation marks omitted). On the one hand, there was no mention of race in Warren's disagreements with Gottschalk and McKinney; Warren was promoted after Rioux told her that "Hispanics work faster"; the single employee reporting to Rioux did not inhibit Warren's ability to do her job, nor threaten or ridicule her; and Rioux's comment about underestimating Warren was an apology, not an insult. Furthermore, Warren does not explicitly argue in her Amended Complaint or Response to Hollingsworth's Motion for Summary Judgment that she was subject to a "hostile work environment," nor that she thought such an environment was in progress. On the other hand, Rioux's comment that "Hispanics work faster," and his permitting a male employee to report to him instead of Warren, were likely more serious incidents than that in *Breeden*, because they (1) inferred a racial preference, and (2) sanctioned a sexist work preference. Moreover, *repeated* comments like "Hispanics work faster" might have amounted to severe ridicule that altered Warren's working conditions due to her race; and if many male employees refused to report to Warren, she would have had less ability to do her job due to her sex. *See Enforcement Guidance*, *supra*

49

("it is protected opposition if the employee complains about offensive conduct that, *if repeated* often enough, would result in an actionable hostile work environment" (emphasis added)). There is no evidence that either incident was repeated.

The Court finds persuasive the EEOC Guidance's approach of interpreting Title VII's retaliation provision with the goal of "encouraging employees to report harassing conduct" early. *Enforcement Guidance*, *supra*. Therefore, the Court will assume that the third Complaint on Warren's list was protected activity, and thus that Warren has established a prima facie case of retaliation.[9] The Court need not decide this issue conclusively because Warren's retaliation claim fails at the next stages of the burden shifting framework.[10]

---

[9] Hollingsworth rests its case that Warren has not made out a prima facie case of retaliation on its argument that she did not engage in protected activity. Hollingsworth's cursory invocation of causation in its Motion for Summary Judgment is inapposite because it depends upon its (at this stage unproven) assertion that Warren's only complaint of discrimination occurred after she was fired. (ECF No. 34, Motion for Summary Judgment, PageID 192). *See* Fed. R. Civ. Pro. 56(a) ("A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought." (emphasis added)); *Stanley v. ExpressJet Airlines, Inc.*, 356 F. Supp. 3d 667, 694 (E.D. Mich. 2018) ("Issues 'adverted to . . . in a perfunctory manner, unaccompanied by some effort at developed argumentation,' are deemed waived." (quoting *Clemente v. Vaslo*, 679 F.3d 482, 497 (6th Cir. 2012))).

[10] For the same reason, the Court need not further consider Warren's allegations that Rioux: once instructed her to talk a black woman out of filing a complaint of race discrimination because she is also black, (ECF No. 34-6, PageID 840); called a majority-black group of union workers "you people," (ECF No. 34-6, PageID 837); told another employee that black women could not wear tight pants because black women are "shaped differently," (ECF No. 34-6, PageID 839); asked Warren if another employee was her "cousin" because they "look[ed] alike," (ECF No. 34-6,

### 2. Hollingsworth has articulated a legitimate reason for firing Warren.

**Legal Standard**

Assuming that Warren engaged in protected activity, the burden shifts to Hollingsworth to "articulat[e] a legitimate, non-retaliatory reason for its action." *Briggs*, 11 F.4th at 515.

**Arguments**

Both parties' briefs assume that Hollingsworth's firing of Warren is the allegedly retaliatory act at issue here. *See* (ECF No. 34, Motion for Summary Judgment, PageID 192; ECF No. 36, Response to Motion for Summary Judgment, PageID 911–12). Hollingsworth's counsel also proceeded with this assumption at oral argument, and Warren's counsel did not indicate any disagreement with it.

Hollingsworth's Motion for Summary Judgment offers the following legitimate, non-retaliatory reason for terminating Warren: she was on a PIP for interacting rudely with her employees; during Sturm's investigation, several

---

PageID 833); and did nothing to stop delivery drivers from delivering all of the "good boxes" to "Hispanics and [Rioux]'s favorite people," (ECF No. 34-6, PageID 817–19). (The Court notes that Warren does not contest that the "you people" comment was made in front of a group of employees, not-all-African-American, who had transferred to Hollingsworth from prior employment with another company at the Temperance facility.)

    The Court has not mentioned these allegations earlier in this section because neither party has indicated, and none of the depositions mentioned, when any of these events took place, nor whether they occurred before Warren's complaint to Rioux and Paulson at issue here.

employees wrote statements complaining of her disrespecting them; *and* she leaked confidential company information about employee reviews, suggesting that low-performing employees would be fired. (ECF No. 34, Motion for Summary Judgment, PageID 186–88).

Warren responds that, "[a]t a minimum," Hollingsworth's "reliance on inadmissible evidence creates a genuine issue of material fact as to the reliability and credibility of such evidence." (ECF No 36, Response to Motion for Summary Judgment, PageID 906) (citing *Laster*, 746 F.3d 714).

**Analysis**

As discussed above, Hollingsworth may rely on Warren's acknowledgment of the PIP—while noting that Warren disputes its accuracy—and on the employee statements gathered by Sturm, which are offered to shed light on how the company made its decision, rather than to establish the absolute truth of how Warren acted. Therefore, Hollingsworth has met its burden of providing a legitimate, non-retaliatory reason for firing Warren: it did so because Sturm's investigation uncovered employee complaints about her attitude and reports that she had been leaking confidential information on the warehouse floor.

### 3. No jury could reasonably find that Hollingsworth's reason for firing Warren is a pretext for retaliation.

**Legal Standard**

Because Hollingsworth has articulated a legitimate reason for firing Warren, the burden shifts back to Warren "to demonstrate that th[is] . . . reason is actually a pretext to hide unlawful retaliation." *Briggs*, 11 F.4th at 515 (internal citation and quotation marks omitted).

Typically, Plaintiffs demonstrate pretext by showing "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009). On these categories, the Sixth Circuit has elaborated:

> The first category implicates evidence that the proffered bases for the plaintiff's discharge never happened, and the second category requires that the plaintiff admit the factual basis underlying the employer's proffered explanation and further admit that such conduct could motivate dismissal. The third category of pretext consists of evidence that other employees, particularly employees outside the protected class, were not disciplined even though they engaged in substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff. A showing of the third type of pretext is a direct attack on the credibility of the employer's proffered motivation for disciplining the plaintiff and, if shown, permits, but does not require, the factfinder to infer illegal discrimination from the plaintiff's prima facie case.

*Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) (internal citations, quotation marks, and alterations omitted).

53

But these three categories are not exclusive. *Chen*, 580 F.3d at 400 n.4; *Miles*, 946 F.3d at 888. Ultimately, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen*, 580 F.3d at 400 n.4. "[S]ummary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation." *Id.*

**Arguments**

Hollingsworth's Motion for Summary Judgment asserts that Warren cannot establish that the legitimate business reason it offers for her termination is pretext. (ECF No. 34, Motion for Summary Judgment, PageID 188–89) (citing *Jaime v. Village of St. Charles*, No. 349901, 2020 WL 4554979, at *4–5 (Mich. Ct. App. Aug. 6, 2020) and *Major v. Newberry*, 892 N.W.2d 402 (Mich. Ct. App. 2016)).

In response, Warren offers two arguments that Hollingsworth's reason is pretext. (ECF No. 36, PageID 906–09) (citing *Chen*, 508 F.3d at 400 for the most common ways to prove pretext). First, Warren argues that there is a genuine dispute as to whether Hollingsworth's reason has any basis in fact. To support this argument, Warren claims that the PIP is inadmissible; that the employee statements collected by Sturm do not label Warren "the aggressor" and do not address her confrontation with McKinney; that McKinney admitted in his email that he swore at Warren, but he was never disciplined; that only Davis's written statement mentions Warren's leaking employee performance information; and that Warren "emphatically denies"

54

that she engaged in any of the conduct relied upon by Hollingsworth. (PageID 907–08). Second, Warren argues that Hollingsworth's proffered reason was insufficient to motivate her firing, because the PIP, in addressing Warren's attitude and treatment of employees, allowed her a 60-day improvement period, and because "[t]here is no allegation here that Warren used confidential information *outside* the Company." (PageID 908–09). Additionally, at oral argument, Warren's counsel claimed that Warren's alleged "sharing information about the Company on the floor" was the "*sole*" possible explanation for her termination, because that was the only explanation listed on her Employee Change Notice.

Hollingsworth replies that Warren's "mere denials" of its reason are insufficient to establish pretext. (ECF No. 45, Reply to Motion for Summary Judgment, PageID 2712–13) (citing *Novara v. Spartannash Assoc.*, No. 16-cv-838, 2017 WL 4285439, at *5–6 (W.D. Mich. Sept. 27, 2017)). And it asserts that "the fact that [Warren] was terminated prior to the proposed PIP completion is not evidence of pretext" because Sturm's "investigation revealed [Warren]'s behavior rose to a level that was now unacceptable." (PageID 2712). Finally, at oral argument, Hollingsworth's counsel argued that the company had maintained all along that it fired Warren for both her leaking confidential information *and* her attitude towards her employees, notwithstanding the Employee Change Notice's omission of the latter explanation.

**Analysis**

Faced with the record before the Court, no jury could reasonably conclude that Hollingsworth's legitimate reason for firing Warren was a pretext for retaliation. To begin with, Warren cannot restrict Hollingsworth to the short termination explanation contained in the Employee Change Notice. For one thing, the single-page Notice provides very little space to explain "[w]hy" an employee has been discharged and to offer "[a]dditional [c]omments/[i]nformation"; it does not require, nor even invite, an exhaustive justification of the recorded change. *See* (ECF No. 34-5, Employee Change Notice, PageID 740). For another, Sturm testified that she and Paulson considered the employee statements about Warren's attitude, which statements they also produced, when deciding to terminate her. (ECF No. 34-1, Dep. of S. Sturm, Page 315–21). And for a third, the Sixth Circuit "and others have held that providing *additional* non-discriminatory reasons that do not conflict with the one stated at the time of discharge does not constitute shifting justifications" that would suggest pretext. *Miles*, 946 F.3d at 891 (internal citation and quotation marks omitted).

Warren's argument that there is a genuine dispute as to whether Hollingsworth's reason had any basis in fact also fails. Her claims about the February 20th confrontation with McKinney are inapposite, because she was not fired for that confrontation, nor for her general treatment of McKinney. Rather, she was

fired for her treatment of lower-level employees, not other Supervisors, and for leaking confidential information. The former explanation may have been supported by the fact that Warren was already on a PIP for her condescending attitude, which fact Warren admitted to at her deposition (with the caveat that she disputed the PIP's accuracy). (ECF No. 34-6, Dep. of R. Warren, PageID 855–58). But more importantly, as noted above, the explanation was supported by numerous employee statements that Sturm procured during her February 21st investigation. (ECF No. 34-5, Statement of E. C., PageID 735–37; ECF No. 34-5, Statement of W. Sakovich, PageID 734; ECF No. 34-5, Statement of D. Davis, PageID 738). Thus, this explanation did not lack factual basis.

The latter explanation was supported by Davis' written statement attesting that Patterson told her that Warren had leaked confidential to him. (ECF No. 34-5, Statement of D. Davis, PageID 738). This statement is enough to find that Hollingsworth's "leaking" concern did not lack any basis in fact: as previously discussed, Hollingsworth had no reason to doubt Davis, and did have reason to believe that Warren would behave inappropriately, given the other complaints it had received about her. Moreover, Rioux had corroborated Davis's statement by noting that the employees Warren had allegedly identified as soon-to-be-terminated were in fact low-performing. (ECF No. 34-1, Dep. of S. Sturm, PageID 295).

Warren's "emphatic denials" of Hollingsworth's reason for terminating her cannot change these conclusions, because Warren did not express them to Hollingsworth *before* her termination. *See Hill v. Herbert Roofing & Insulation, Inc.*, No. 13-cv-11228, 2014 WL 1377587, at \*8 (E.D. Mich. Apr. 8, 2014) (citing *McConnell v. Swifty Transp. Inc.*, 198 F. App'x 438, 444 (6th Cir. 2006)) ("[E]ven a hasty decision can be honestly held."). And even if Warren had registered these denials, the evidence just discussed still would have amounted to a sufficient factual basis for Hollingsworth's reasons for its decision. *Cf. Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 802 (6th Cir. 2007) ("An employee's opinion that he did not perform poorly is irrelevant to establishing pretext where the employer reasonably relied on specific facts before it indicating that the employee's performance was poor.").

Warren's argument that Hollingsworth's reason for terminating her was insufficient also fails. While Warren is likely correct that the PIP allowed her a 60-day improvement period, the PIP was not a binding contract. More importantly, she was not fired for the conduct that prompted Hollingsworth to place her on a PIP. *After* Hollingsworth presented Warren with the PIP, it received at least three employee complaints of mistreatment from Warren, and at least one report that Warren was leaking confidential corporate information on the floor. (ECF No. 34-5, Statement of E. C., PageID 735–37; ECF No. 34-5, Statement of W. Sakovich,

PageID 734; ECF No. 34-5, Statement of D. Davis, PageID 738). Hollingsworth escalated Warren's punishment in response to new information about Warren's escalating infractions.

And the new information about Warren leaking confidential information out on the floor was particularly serious. This conduct violated the Confidentiality Agreement that Warren had signed, which prohibited her from "disclos[ing] to *any person* . . . any of the Company's confidential information without written consent of the Company, except . . . on the behalf of the Company in connection with the Company's business." (ECF No. 34-5, Confidentiality Agreement, PageID 609) (emphasis added). Certainly, Warren's leak was not "on behalf of the Company": its natural impact was to lower morale and increase employee paranoia, division, and gossip. And, despite Warren's argument to the contrary, this provision expressly applies to information leaked to "any person," and not only to people outside of the company. Similarly, Warren's conduct violated the Employee Handbook's prohibition on "inappropriate use of confidential information," which the Handbook explicitly states "is cause for disciplinary action up to and including termination." (ECF No. 34-5, Employee Handbook, PageID 611).

But even without the Handbook and the Confidentiality Agreement, Hollingsworth's reason would have warranted Warren's termination. It was reasonable for Hollingsworth to conclude that a supervisor who (in its view) belittled

and acted aggressively against her employees, and whom it did not trust to keep sensitive personnel discussions private, could not perform her job satisfactorily. And it was not unusual that Hollingsworth quickly terminated Warren, given the company's prior and subsequent turnover and termination rates. *See* (ECF No. 34-1, Dep. of S. Sturm, PageID 223 (Sturm was terminated); ECF No. 34-2, Dep. of M. Rioux, PageID 424 (Rioux was terminated); ECF No. 34-4, Dep. of S. Paulson, PageID 523, 541–43 (noting general high turnover rate and that McKinney was terminated)). Indeed, Warren has not identified any employee who engaged in substantially identical cumulative conduct and retained their job.

Finally, the Court notes that temporal proximity is not enough to establish pretext here. Warren raises the issue of temporal proximity in the prima facie case of retaliation section of her Response. (ECF No. 36, Response to Motion for Summary Judgment, PageID 911–12). But even if she had raised it at the pretext stage, "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012). In other words, because Warren's other pretext arguments fail, she can establish pretext by the fact that she was fired within a month and a half of making a protected complaint.

60

**CONCLUSION**

Having considered the facts in the light most favorable to Warren (the non-moving party), the Court, for the reasons discussed above, hereby **GRANTS** Hollingsworth's Motion for Summary Judgment.

**IT IS SO ORDERED.**

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: January 6, 2022

61